# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE BGC PARTNERS, INC. DERIVATIVE LITIGATION | CONSOLIDATED C.A. No. 2018-0722-AGB |

## MEMORANDUM OPINION

Date Submitted: June 6, 2019
Date Decided: September 30, 2019

Nathan A. Cook and Kimberly A. Evans, GRANT & EISENHOFER P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen, Christopher J. Orrico, and Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Attorneys for Plaintiffs Roofers Local 149 Pension Fund and Northern California Pipe Trades Trust Funds.*

C. Barr Flinn and Paul Loughman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Eric Leon, Nathan Taylor, and Amanda Meinhold, LATHAM & WATKINS LLP, New York, New York; *Attorneys for Defendants Howard Lutnick, CF Group Management, Inc., Cantor Fitzgerald, L.P., and Nominal Defendant BGC Partners, Inc.*

Raymond J. DiCamillo, Kevin M. Gallagher, and Kevin M. Regan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joseph De Simone and Matthew E. Fenn, MAYER BROWN LLP, New York, New York; Michele L. Odorizzi, MAYER BROWN LLP, Chicago, Illinois, *Attorneys for Defendants Linda Bell, Stephen Curwood, William Moran, and John Dalton.*

**BOUCHARD, C.**

This case concerns a transaction in which BGC Partners, Inc.—a public company controlled by Howard Lutnick—paid $875 million to acquire Berkeley Point Financial LLC, a private company also controlled by Lutnick. Plaintiffs are two stockholders of BGC. They allege that Lutnick, who stood on both sides of the transaction, was highly motivated to—and did—have BGC overpay for Berkeley Point because his economic interest in Berkeley Point (60%) far exceeded his economic interest in BGC (13.8%), and that the outside directors of BGC acted in bad faith in allowing this to happen.

The complaint asserts three derivative claims for breach of fiduciary duty against Lutnick as a director, controlling stockholder, and officer of BGC; two entities through which Lutnick controls BGC and Berkeley Point; and BGC's four outside directors. Defendants have filed motions to dismiss that raise two issues. First, defendants assert that the complaint should be dismissed in its entirety because plaintiffs have failed to establish that it would have been futile for them to make a demand on BGC's board to decide whether or not BGC should pursue the claims itself. Second, the outside directors assert that the claim brought against them should be dismissed for failure to state a claim for relief.

For the reasons explained below, the court concludes that both of the grounds for dismissal that defendants have advanced fail. Accordingly, defendants' motions to dismiss will be denied.

1

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Verified First Amended Stockholder Derivative Complaint ("Complaint") and documents incorporated therein,[1] including documents produced in response to a demand to inspect books and records under 8 *Del. C.* § 220.[2] Any additional facts are subject to judicial notice.

### A.    The Players

On September 8, 2017, BGC Partners, Inc. ("BGC" or the "Company") purchased Berkeley Point Financial LLC ("Berkeley Point") from Cantor Commercial Real Estate Company, L.P. ("CCRE") for $875 million. BGC simultaneously invested $100 million for a 27% interest in CCRE's remaining commercial mortgage-backed securities business (the "CMBS Business"). These two transactions are referred together in this decision as the "Transaction".

Nominal defendant BGC is a Delaware corporation headquartered in New York that provides brokerage and financial services. Its predecessor entity, BGC Partners, L.P., was formed in 2004 when it was spun off by Cantor Fitzgerald, L.P. ("Cantor"). In 2008, BGC Partners, L.P. merged with eSpeed, Inc, another former Cantor subsidiary, to form the public company BGC Partners, Inc.

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

The plaintiffs in this case are Roofers Local 149 Pension Fund and Northern California Pipe Trades Trust Funds (together, "Plaintiffs"). They allege they were stockholders of BGC at the time of the Transaction and have been stockholders continuously since then.[3]

The defendants in this case consist of Howard Lutnick, the Chairman and CEO of BGC; four other individuals on BGC's board at the time of the Transaction; and two entities that—along with Lutnick—sit on top of a complicated web of affiliated entities and appear on both sides of the Transaction: Cantor and CF Group Management, Inc. ("CF Group").

Cantor is a privately owned financial services and brokerage firm based in New York. CF Group is a New York corporation that serves as Cantor's managing general partner. Lutnick is the sole stockholder of CF Group. He also owns approximately 60% of Cantor, and has sole voting control of Cantor.[4]

At all relevant times, Cantor, CF Group, and Lutnick controlled BGC through their beneficial ownership of 100% of BGC's Class B super-voting common stock,

---

[2] As a condition of receiving documents, plaintiff Roofers Local 149 Pension Fund agreed that, if it filed a complaint relating to its Section 220 demand, the complaint "shall be deemed to incorporate by reference the entirety of the books and records on which inspection is permitted." BGC Defs.' Opening Br. 18-19 (Dkt. 36).

[3] Compl. ¶¶ 10-11.

[4] *Id.* ¶¶ 13-14.

giving them 60% of the Company's total voting power.[5]  In 2017, Cantor and Lutnick owned 17.3% and 2.8%, respectively, of BGC's common stock equivalents.

Before the Transaction, Berkeley Point was a wholly-owned subsidiary of CCRE, which, in turn, was an affiliate of Cantor.  The Transaction provided that Cantor would receive BGC's $875 million payment to acquire Berkeley Point. Lutnick allegedly had "much larger ownership interests" in Cantor (60%) than BGC (approximately 13.2%), which "motivated him to cause BGC to overpay for Berkeley Point."[6]  Thus, according to the Complaint, "Lutnick's ownership interests in Cantor and BGC guaranteed that he would personally receive approximately 46.8% of every dollar that BGC overpaid" in the Transaction.[7]

Lutnick has been the Chairman of the Board and CEO of BGC and its predecessors (including eSpeed) since June 1999.[8]  Lutnick also serves or has served on the boards of multiple other Cantor-affiliated entities, including (i) eSpeed; (ii) ELX Futures; (iii) GFI; (iv) Newmark; and (v) Cantor Exchange.[9]  Lutnick allegedly

---

[5] Id. ¶ 15.

[6] Id. ¶ 3.  The 13.2% figure is the rounded sum of (i) Lutnick's personal interest in BGC common stock equivalents (2.8%) and (ii) 60% of Cantor's interest in BGC common stock equivalents (17.3% * 60% = 10.38%).

[7] Id.

[8] Id. ¶ 18.

[9] Id. ¶ 19.

has a "reputation as a Wall Street bruiser" and is "famously sharp-elbowed."[10] Lutnick also has strong ties to Haverford College, his alma mater. He has served on the Haverford Board of Managers for twenty-one years and donated at least $65 million to the college over the past twenty-five years, including a record-setting $25 million donation in 2014.[11] Lutnick has described the motivation for his generous giving as "Love" and the belief that Haverford people "make [his] life special."[12]

The other four individual defendants are Linda Bell, Stephen Curwood, William Moran, and John Dalton. At all relevant times, they each were members of the BGC board, its Audit Committee, and the Special Committee that evaluated the Transaction.[13] They are referred to hereafter, at times, collectively as the "Special Committee Defendants." In February 2015, Lutnick placed all of the Special Committee Defendants on a publicly-filed list of potential appointees to the board of GFI, an entity that BGC acquired in 2016.[14] Other relationships between Lutnick and each of the four members of the Special Committee are discussed in detail later in Sections III.C-D of this opinion.

---

[10] *Id.* ¶ 2.

[11] *Id.* ¶ 20.

[12] *Id.*

[13] *Id.* ¶ 5.

[14] *Id.* ¶ 31.

### B. Lutnick and Cantor Set the Stage for the Transaction

On February 11, 2017, Lutnick informed BGC's Audit Committee (consisting of Bell, Curwood, Dalton, and Moran) that BGC's management was considering acquiring Berkeley Point.[15] Berkeley Point is a designated underwriting and servicing lender for multi-family homes from government-sponsored entities such as the Department of Housing and Urban Development, Freddie Mac, and Fannie Mae.[16] BGC and Newmark—a subsidiary of BGC—had been originating business for Berkeley Point since late 2011.[17]

Lutnick told the Audit Committee on February 11 that a potential purchase price for Berkeley Point would be in the "low $700 million range" and that Cantor already had reached agreements in principle with outside investors in CCRE—a Cantor affiliate that wholly-owned Berkeley Point—to buy their interests, setting the stage for a sale of Berkeley Point to BGC.[18] Lutnick also informed the Audit Committee that BGC management was considering a potential $150 million investment by BGC in CCRE that would be "riskier and more volatile than Berkeley Point's business" but would allow BGC to access data about properties that would

---

[15] *Id.* ¶ 63.

[16] *Id.* ¶ 17.

[17] *Id.* ¶¶ 59, 61.

[18] *Id.* ¶ 63.

6

be beneficial to BGC's brokerage business.[19]  These were the first steps in a multi-step plan called "Project Referee," which would culminate in a spin-off and an initial public offering of a combined Newmark and Berkeley Point entity by the end of 2017.[20]

On March 14, 2017, Bell, Curwood, Dalton, and Moran, were appointed to a Special Committee to evaluate the merits of the proposed Transaction.[21]  Debevoise & Plimpton acted as the Special Committee's legal advisor and Sandler O'Neill acted as its financial advisor in connection with the Transaction.[22]

The Special Committee resolutions recognized that Lutnick had a potential conflict of interest and was not disinterested or independent with respect to the Transaction.[23]  The Special Committee nevertheless "immediately authorized management—*i.e.*, Lutnick—to proceed with negotiating" the Transaction.[24]  The Special Committee resolutions also provided that officers of the Company, including Lutnick, had to furnish information to the Special Committee members but that obligation did not extend to "any items in the possession of or available to officers

---

[19] *Id.*

[20] *Id.* ¶ 64.

[21] *Id.* ¶ 66 & n.4.

[22] *Id.* ¶¶ 54, 56.

[23] *Id.* ¶ 66.

[24] *Id.*

7

of [BGC] which is held in their capacity as officers of Cantor or its affiliates" other than BGC, which was not otherwise provided to BGC.[25] The resolutions "placed no corresponding restriction on Lutnick's ability to share BGC information with Cantor."[26]

### C.    The Negotiation Process

Plaintiffs allege that Lutnick "controlled the negotiations and coopted the Special Committee," citing as evidence the fact that "the Special Committee's Co-Chair, Moran, emailed Lutnick on April 6, 2017 and asked whether Lutnick had 'changed *our* timetable for execution???'" of the Transaction.[27] Lutnick attended multiple BGC board and Special Committee meetings, and directed certain changes to the modeling used to determine the valuation of Berkeley Point.[28] Neither the Special Committee nor BGC considered any alternative transactions.[29]

Plaintiffs further allege that the Special Committee's failure to look out for BGC's interests in negotiating the price of the Transaction can be seen in the upward trajectory of the amounts Cantor proposed BGC pay for Berkeley Point, which moved from an initial indication in the low $700 million range in February 2017 to

---

[25] *Id.* ¶ 67.

[26] *Id.* ¶ 68.

[27] *Id.* ¶ 69.

[28] *Id.* ¶¶ 71-72.

[29] *Id.* ¶ 70.

$875 million about five months later, in July 2017. The first upward movement occurred on March 2, 2017, when Cantor increased the proposed purchase price from the low $700 million range that Lutnick floated on February 11, to $750 million for a 95% stake in Berkeley Point.[30]

The amount increased again on April 21, 2017, when Cantor submitted a term sheet to BGC proposing that BGC would invest $1 billion to obtain a limited partnership interest in CCRE, which implied a price of $850 million for a 95% interest in Berkeley Point and contemplated that the remaining 5% would be retained by Cantor and/or its affiliates.[31] The other $150 million "accounted for the proposed investment in CCRE's remaining Cantor CMBS Business."[32] The term sheet contemplated granting a put option to BGC that would allow BGC, no earlier than five years after closing, to put to CCRE its interest in all of CCRE in exchange for 100% of Berkeley Point's equity and a return of its deemed capital account in the Cantor CMBS Business, less $30 million.[33] The term sheet indicated that this $30 million was the "amount . . . attributable to the 5% of [Berkeley Point] owned by [Cantor and/or its affiliates]."[34] Plaintiffs extrapolate from this valuation of a 5%

---

[30] *Id.* ¶ 73.

[31] *Id.* ¶ 74.

[32] *Id.*

[33] *Id.* ¶ 75.

[34] *Id.*

9

interest in Berkeley Point that the 95% interest proposed to be sold to BGC "should have been valued at approximately $570 million, a far cry from Cantor's egregiously inflated asking price of $850 million."[35]

On May 11, 2017, the Special Committee received a presentation from Cantor and Lutnick, indicating that the purchase price of Berkeley Point would be approximately $850 million. The minutes do not indicate that the Special Committee pushed back on the increase in the purchase price from $750 million proposed about two months earlier, on March 2, to approximately $850 million.[36] The presentation also acknowledged that BGC had caused its subsidiary, Newmark, to confer substantial value on Berkeley Point, and thus Cantor, yet the value BGC had contributed was not used as leverage in negotiations.[37]

On May 23, 2017, Cantor provided to the Special Committee a term sheet that was substantially similar to the April 21, 2017 term sheet.[38] On May 25, 2017, at a meeting of the Special Committee, Sandler O'Neill presented its preliminary perspective as to a proper valuation of the Transaction. During the meeting, Sandler O'Neill acknowledged that it needed to better understand "the economic terms of

---

[35] *Id.* ¶ 76.

[36] *Id.* ¶ 80.

[37] *Id.* ¶ 81.

[38] *Id.* ¶ 83.

CCRE's initial investment in Berkeley Point in 2014 and the prices at which CCRE's outside investors invested and would exit."[39]

### D. Sandler O'Neill's Analysis of the Transaction

On June 4 and 5, 2017, Sandler O'Neill presented the Special Committee with an analysis of the proposed Transaction.[40] The presentation contained eight reasons why Cantor's $880 million total valuation of Berkeley Point overvalued the company.[41]

One reason was that the multiples implied by Cantor's valuation were 50-100% higher in six different metrics than those Cantor paid when it acquired Berkeley Point in April 2014 for $259.3 million.[42]

Several other reasons concerned the only purportedly comparable company that had been identified for Berkeley Point: Walker & Dunlop. To start, the $880 million valuation was based on a multiples comparison to Walker & Dunlop, but Berkeley Point had not experienced the same consistency or growth as Walker & Dunlop.[43] Sandler O'Neill also pointed out that BGC's ownership of Berkeley Point would be illiquid and thus justify a discount relative to Walker & Dunlop, which

---

[39] *Id.* ¶ 84.

[40] *Id.* ¶ 86.

[41] *Id.*

[42] *Id.* ¶ 86(a).

[43] *Id.* ¶ 86(b).

11

was a publicly traded company.[44]  Sandler O'Neill further pointed out that Walker & Dunlop's price had increased significantly between February 2017, when Cantor and Lutnick first floated the idea of the acquisition, and the May 2017 term sheet, which Cantor allegedly used as leverage to increase the price of Berkeley Point.[45] Finally, after explaining that Berkeley Point's growth rate would have lagged behind Walker & Dunlop's if originations from Newmark—BGC's own subsidiary—were excluded, Sandler O'Neill presentation stated bluntly that BGC "should not be paying for the value it already brings to Berkeley Point."[46]

Sandler O'Neill's presentation also expressed concern that (i) the Transaction structure was designed to maximize Cantor's tax benefits, but limited BGC's ability to exercise control over Berkeley Point, (ii) BGC was being asked to bear the risk of Berkeley Point's questionable value proposition for Newmark, and (iii) mortgage related government sponsored entities may change their procedures and protocols in a way that could adversely impact Berkeley Point.[47]

In light of these concerns, Sandler O'Neill recommended that the valuation should be reduced to $720 million, which it contended would be an "appropriate" valuation, although it recognized there were reasons why BGC should pay even

---

[44] *Id.* ¶ 86(d).

[45] *Id.* ¶ 86(f).

[46] *Id.* ¶ 86(c).

[47] *Id.* ¶ 86(e), (g)-(h).

less.[48]  Sandler O'Neill also recommended that BGC seek other concessions, including "requiring Cantor to bear losses to the full extent of its investment, a change of the preferred return rate to be earned by BGC from 5% to 6%, and an increase in BGC's share of gross returns from 60% to 90%."[49]

### E.  Terms of the Transaction

At a June 6, 2017 meeting, the Special Committee proposed to Cantor the $720 million valuation that Sandler O'Neill had endorsed.[50]  Cantor offered a counter proposal, the terms of which are not disclosed in the Special Committee's meeting minutes, and which the Special Committee discussed for no more than 75 minutes.[51]  After the negotiations resumed, the parties reached an agreement that BGC would acquire 100% of the equity interest in Berkeley Point for $875 million and would invest $100 million in the CMBS Business for a period of five years, with a preferred return of 5% and a prohibition on distributions until BGC received said return.[52]

---

[48] *Id.* ¶ 87.

[49] *Id.* ¶ 89.

[50] *Id.* ¶ 90.

[51] *Id.*

[52] *Id.* ¶ 91.

BGC did not receive other protections that Sandler O'Neill had urged it to seek.[53] The written agreement granted Cantor 100% voting control over the general partner of the Cantor CMBS Business in which BGC had invested, allegedly disadvantaging BGC.[54] Sandler O'Neill did not issue a fairness opinion with respect to BGC's investment in the CMBS Business, but did issue an opinion that the "terms of the investment were 'reasonable' to BGC and its investors."[55]

On July 13, 2017, the Special Committee approved the Transaction, which was not subject to approval by BGC's stockholders. On September 8, 2017, the Transaction closed.[56]

### F. The Newmark IPO

By October 23, 2017, Berkeley Point had been integrated into Newmark, which completed an initial public offering about two months later on December 19, 2017.[57] Based on the IPO price, the value of Newmark, after Berkeley Point had been integrated into it, was approximately $1.84 billion. From this, and the fact that Newmark allegedly derived 30.6% of its EBITDA from Berkeley Point, Plaintiffs contend that the Newmark IPO implied a value for Berkeley Point of only $563

---

[53] *Id.* ¶ 93.

[54] *Id.* ¶ 94.

[55] *Id.* ¶ 96.

[56] *Id.* ¶ 97.

[57] *Id.* ¶ 98.

14

million (*i.e.*, 30.6% of approximately $1.84 billion), just three months after BGC had paid $875 million to acquire Berkeley Point in the Transaction.[58]

## II. PROCEDURAL HISTORY

In October and November 2018, Plaintiffs each filed derivative actions in this court challenging the Transaction. On December 4, 2018, those actions were consolidated. On February 12, 2019, Plaintiffs filed their Verified First Amended Stockholder Derivative Complaint (as defined above, the "Complaint").

The Complaint contains three derivative claims. Count I asserts that BGC's directors breached their fiduciary duties by approving a related-party transaction "on unfair terms and pursuant to an unfair process."[59] Count II asserts that Lutnick, CF Group, and Cantor, as controlling stockholders of BGC, "breached their fiduciary duties by using their control over BGC and the Special Committee Defendants to cause the Company to enter into the [Transaction] on unfair terms and pursuant to an unfair process."[60] Count III asserts that Lutnick breached his fiduciary duties "as an officer of BGC by dominating, directing, and otherwise interfering with the process through which the Company entered into the [Transaction], including by

---

[58] *Id.* ¶ 99.
[59] *Id.* ¶ 137.
[60] *Id.* ¶ 141.

15

taking control of the Company's interactions with rating agencies and financing sources."[61]

In March 2019, defendants filed two motions to dismiss. In one motion, Lutnick, CF Group, and Cantor moved to dismiss the Complaint in its entirety under Court of Chancery Rule 23.1 based on Plaintiffs' failure to make a demand on BGC's board before initiating derivative litigation. In the second motion, the Special Committee Defendants also moved to dismiss under Rule 23.1 and separately moved to dismiss Count I of the Complaint as to them under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. No motion was filed seeking dismissal of Counts II and III under Rule 12(b)(6). After the completion of briefing, the court heard argument on the motions on June 6, 2019.[62]

## III. ANALYSIS

Defendants' motions raise two issues. First, have Plaintiffs pled sufficient particularized facts to show that making a demand on the BGC board before filing their derivative claims would have been futile? This issue is discussed in Sections A-C below. Second, if the answer to the first question is yes, does the Complaint state a claim for relief against each of the Special Committee Defendants under the

---

[61] *Id.* ¶ 146.

[62] Dkt. 68; *see* Tr. (June 6, 2019) (Dkt. 69).

16

test set out in *In re Cornerstone Therapeutics Inc., Shareholder Litigation*?[63]  This

issue is discussed in Section D below.

### A.  Demand Futility Standards

Under Court of Chancery Rule 23.1, a stockholder who wishes to bring a

derivative claim on behalf of a corporation must "allege with particularity the efforts,

if any, made by the plaintiff to obtain the action the plaintiff desires from the

directors or comparable authority and the reasons for the plaintiff's failure to obtain

the action or for not making the effort."[64]  This requirement stems from a "basic

principle of the Delaware General Corporation Law . . . that the directors, and not

the stockholders, manage the business and affairs of the corporation."[65]

"The decision to bring or to refrain from bringing suit on behalf of the

corporation is the responsibility of the board of directors."[66]  This allows "a

corporation, on whose behalf a derivative suit is brought, the opportunity to rectify

the alleged wrong without suit or to control any litigation brought for its benefit."[67]

Under the heightened pleading requirements of Rule 23.1, "conclusionary

---

[63] 115 A.3d 1173 (Del. 2015).

[64] Ch. Ct. R. 23.1.

[65] *FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *2 (Del. Ch. Apr. 21, 2009).

[66] *Id.*

[67] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

allegations of fact or law not supported by the allegations of specific fact may not be taken as true."[68]

Under Delaware law, courts employ two different tests for determining whether demand may be excused:  the *Aronson* test and the *Rales* test.  The court applies the test from *Aronson v. Lewis*[69] when "a *decision* of the board of directors is being challenged in the derivative suit."[70]  On the other hand, the test from *Rales v. Blasband*[71] governs when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[72]  The *Aronson* and *Rales* tests both ultimately focus on the same inquiry, *i.e.*, whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith."[73]

---

[68] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[69] 466 A.2d 375.

[70] *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[71] *Id.*

[72] *Id.* at 933-34, 934 n.9.  The *Rales* test also applies "where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced" and where "the decision being challenged was made by the board of a different corporation."  *Id.* at 934.

[73] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007).

Here, both parties agree that the *Aronson* test applies because Plaintiffs are challenging the Board's decision to enter into the Transaction.[74] Under that test, the court asks "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[75] Plaintiffs have advanced arguments under both prongs of *Aronson.* Those arguments are considered next, in reverse order.

## B.    Plaintiffs' Argument Under the Second Prong of *Aronson* Fails

Focusing on the second prong of *Aronson*, Plaintiffs argue that "demand is excused as a matter of law" simply because the Transaction is subject to entire fairness review since "BGC's controlling stockholder stood on both sides."[76] The court rejected this same argument four years ago in *Teamsters Union 25 Health Services & Insurance Plan v. Baiera.*[77] There, I explained that "[a]lthough this

---

[74] *Id.* at 933-34.

[75] *Aronson*, 473 A.2d at 814.

[76] Pls.' Answering Br. 47. Plaintiffs also argue that the demand is excused under second prong of *Aronson* because "the particularized allegations of the Complaint create a reason to doubt that the members of the Special Committee acted in good faith." *Id.* 39. The court does not address this issue because it finds that demand is excused under the first prong of *Aronson* for the reasons stated in Section III.C.

[77] 119 A.3d 44 (Del. Ch. 2015).

argument has some superficial appeal, it is inconsistent with controlling authority,"[78]

in particular our Supreme Court's decisions in *Aronson* and *Beam v. Stewart*:[79]

> As *Aronson*, *Beam*, and Rule 23.1 make plain, the demand futility test under Delaware law focuses exclusively on whether there is a reasonable doubt that the directors could impartially respond to a demand. . . . Under these authorities, neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry.[80]

In reaching this conclusion, the court did not hold that the presence of a controller is irrelevant to the director-based focus of the demand futility inquiry. Rather, *Teamsters* simply holds, based on well-established precedent, that the second prong of *Aronson* is not *automatically* satisfied when the challenged transaction would be subject to entire fairness review because it involves a controlling stockholder.

That said, our law is not blind to the practical realities of serving as a director of a corporation with a controlling stockholder. As this court explained in *Ezcorp*:

> Delaware Supreme Court decisions have recognized the risk that directors laboring in the shadow of a controlling stockholder face a threat of implicit coercion because of the controller's ability to not

---

[78] *Id.* at 65.

[79] 845 A.2d 1040 (Del. 2004).

[80] *Teamsters*, 119 A.3d at 67.

support the director's re-nomination or re-election, or take the more aggressive step of removing the directors.[81]

Or, as stated more colorfully by then-Vice Chancellor Strine:

> In colloquial terms, the Supreme Court saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).[82]

Because of the dynamics involved where a controlling stockholder stands on both sides of a corporate transaction, there is "an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders."[83]  Put simply, "Delaware is more suspicious when the fiduciary who is interested is a controlling stockholder."[84]

The implications of taking action in the controlling stockholder context is that directors may "preserve their positions and align themselves with the controller by not doing something, *viz.* by not initiating litigation."[85]  Given these practical

---

[81] *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *20 (Del. Ch. Jan. 25, 2016) (citing *Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1116-17 (Del. 1994); and *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997)).

[82] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002).

[83] Leo E. Strine, Jr., *The Delaware Way:  How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005).

[84] *Id.*

[85] *In re EzCorp*, 2016 WL 301245, at *29 n.24.

21

realities, although application of the entire fairness standard to a transaction involving a controller does not automatically satisfy the second prong of *Aronson*, the presence and influence of a controller is an important factor that should be considered in the director-based focus of the demand futility inquiry under the first prong of *Aronson*, particularly on the issue of independence.

Former Chancellor Chandler thoughtfully explained the considerations implicated in considering the question of independence, including where a stockholder has the unilateral power to determine whether a director may continue to receive a benefit, as follows:

> "Independence" does not involve a question of whether the challenged director derives a benefit *from the transaction* that is not generally shared with the other shareholders. Rather, it involves an inquiry into whether the director's decision resulted from that director being *controlled* by another. A director can be controlled by another if in fact he is *dominated* by that other party, whether through close personal or familial relationship or through force of will. A director can also be controlled by another if the challenged director is *beholden* to the allegedly controlling entity. A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.[86]

---

[86] *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002).

Here, the Complaint specifically alleges that Lutnick, through his control of Cantor, had the unilateral power to remove any of BGC's directors at any time:

> Specifically, BGC's public filings provide that BGC is "controlled by Cantor, which has potential conflicts of interest with [BGC] and may exercise its control in a way that favors its interests to [BGC's] detriment." According to the 10-K, this control includes the ability, "without the consent of public holders of [BGC's] Class A common stock, to elect all of the members of [BGC's] board of directors and to control [BGC's] management and affairs." Pursuant to the Company's bylaws and certificate of incorporation, Cantor could use its control of the Company's voting power to call a special meeting at any time for the purpose of "remov[ing], with or without cause, any Director." Accordingly, Lutnick and Cantor had the power to remove any of the BGC directors at will.[87]

With this well-pled fact and the foregoing discussion in mind, the court turns next to the director-based analysis required under the first prong of *Aronson*.

## C. The Complaint's Factual Allegations Create a Reasonable Doubt About the Impartiality of a Majority of the Demand Board

When the Complaint was filed, BGC's board consisted of five directors: Lutnick, three members of the Special Committee that approved the Transaction (Bell, Curwood, and Moran), and a new director (David Richards) who did not consider the Transaction (collectively, the "Demand Board").[88] Therefore, to demonstrate that the Demand Board is unable to consider a pre-suit demand

---

[87] Compl. ¶ 25.

[88] *Id.* ¶ 113.

23

impartially, the Complaint must plead facts that create a reason to doubt that at least three of these five individuals are disinterested or independent.

Defendants concede that Lutnick is interested for purposes of this motion.[89] They could not credibly do otherwise. As previously discussed, Lutnick stood on both sides of the Transaction through his control of Cantor and personally stood to receive almost 47% of every dollar that BGC allegedly overpaid for Berkeley Point because Lutnick's economic interest in Cantor far exceeded his economic interest in BGC. For their part, Plaintiffs do not challenge Richards' impartiality.

Thus, whether or not demand would be futile in this case turns on whether Plaintiffs have plead particularized facts sufficient to create a reasonable doubt that two of the three remaining members of the Demand Board are disinterested or independent. For the reasons explained below, the court concludes that the particularized allegations of the Compliant create a reason to doubt the independence of each of these three individuals. Before analyzing those factual allegations, the court turns to review the recent teachings of our Supreme Court on the issue of director independence in the demand futility context.

"A lack of independence turns on whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested

---

[89] BGC Defs.' Opening Br. 22.

24

party's dominion or beholden to that interested party."[90]   When assessing independence, "our law cannot ignore the social nature of humans or that they are motivated by things other than money, such as love, friendship, and collegiality."[91] At the pleadings stage, a "plaintiff cannot just assert that a close relationship exists, but when the plaintiff pleads specific facts about the relationship—such as the length of the relationship or details about the closeness of the relationship—then this Court is charged with making all reasonable inferences from those facts in the plaintiff's favor."[92]   Relatedly, the court must consider plaintiff's allegations "in their totality and not in isolation from each other."[93]   In short, a plaintiff must allege a "constellation of facts that, taken together, create a reasonable doubt about [the director]'s ability to objectively consider a demand."[94]

Applying these principles, our Supreme Court has reversed Court of Chancery findings of director independence in the demand futility context on three occasions over the past four years under a *de novo* standard of review.  These decisions, which reinforce the importance of considering a plaintiff's factual allegations holistically and affording plaintiff all reasonable inferences, are reviewed next.

---

[90] *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019) (internal quotation marks omitted).

[91] *Id.* (internal quotation marks omitted).

[92] *Id.*

[93] *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

[94] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018).

In *Sanchez*, the Supreme Court ruled that the plaintiffs had "pled particularized facts, that when considered in the plaintiff-friendly manner required, create a reasonable doubt about [the] independence" of a director named Alan Jackson.[95]  Jackson had been close friends for more than five decades with the patriarch of a family (Chairman Sanchez) that held 16% of the company's shares, donated $12,500 to Chairman Sanchez's gubernatorial campaign, and his "personal wealth [was] largely attributable to business interests over which Chairman Sanchez [had] substantial influence."[96]  The high court commented that while Jackson's personal and professional relationships "may be coincidental," they were sufficient to support "a pleading stage inference that Jackson's economic positions derive in large measure from his 50-year close friendship with Chairman Sanchez, and that he is in these positions because Sanchez trusts, cares for, and respects him."[97] Explaining why it had reached a different conclusion about Jackson's independence than the trial court, the Supreme Court stated that "the Court of Chancery's analysis seemed to consider the facts the plaintiffs pled about Jackson's personal friendship with Sanchez and the facts they pled regarding his business relationships as entirely separate issues."[98]

---

[95] 124 A.3d at 1024.

[96] *Id.* at 1020.

[97] *Id.* at 1023.

[98] *Id.* at 1021.

In *Sandys*, the Supreme Court held in a 4-1 decision that one of the directors of Zynga, Inc. (Ellen Siminoff) was not independent of its controlling stockholder (Mark Pincus) because they co-owned a private airplane together.[99] The high court reasoned that co-owning a plane "is not a common thing, and suggests that the Pincus and Siminoff families are extremely close to each other and are among each other's most important and intimate friends."[100] The Supreme Court commented that pleading demand futility "does not require a plaintiff to plead a detailed calendar of social interaction to prove that directors have a very substantial personal relationship rendering them unable to act independently of each other."[101] Rather, the co-ownership of the plane supported a reasonable inference that Siminoff "would not be able to act impartially" as the relationship could be inferred to be one that "one would expect to heavily influence a human's ability to exercise impartial judgment."[102]

Most recently, in *Marchand*, the Supreme Court found there was reason to doubt that a former employee of Blue Bell Creameries USA, Inc. (W.J. Rankin) had the capacity to impartially decide whether to sue the company's CEO, who was a

---

[99] *Sandys v. Pincus*, 152 A.3d 124, 129-31 (Del. 2016).

[100] *Id.* at 130.

[101] *Id.*

[102] *Id.*

member of the Kruse family that had run Blue Bell for generations.[103] Rankin started as an assistant to the CEO's father, rose to the position of CFO during his 28 years with the company, and was added to the Blue Bell board while he was an employee with the support of the Kruse family.[104] The family had spearheaded efforts that led to a $450,000 donation to a local college in Rankin's name and resulted in the new agricultural facility at the college being named after Rankin.[105] The high court reasoned that these facts, "support a reasonable inference that there are very warm and thick personal ties of respect, loyalty, and affection,"[106] and that, like in *Sanchez* and *Pincus*, "the important personal and business relationship that Rankin and the Kruse family have shared supports a pleading-stage inference that Rankin cannot act independently."[107] Notably, the Supreme Court placed little if any weight on the fact that Rankin had voted differently from the CEO in the past, explaining that "the decision whether to sue someone is materially different and more important than the decision to part company with that person on a vote about corporate governance."[108]

---

[103] 212 A.3d at 818-19.

[104] *Id.* at 808.

[105] *Id.* at 819.

[106] *Id.*

[107] *Id.*

[108] *Id.*

With the foregoing guidance in mind, the court turns to consider the factual allegations of the Complaint with respect to the three members of the Special Committee who were on the Demand Board.[109]

### 1. William Moran

Moran and Lutnick's professional relationship spans approximately twenty years, during which Moran has served with Lutnick on the boards of *four* Cantor-affiliated companies: (i) eSpeed, which was BGC's predecessor, from 1999 to 2005; (ii) ELX Futures, of which Lutnick was a co-founder and Chairman, from 2009 to 2013; (iii) GFI, from February 2015 until it was merged with BGC in January 2016; and (iv) BGC, since 2013.[110] Defendants downplay the significance of the number of boards on which Moran and Lutnick have served together based on the fact that most of it occurred sequentially and did not overlap.[111] To my mind, however, that Moran has served on at least one Cantor-affiliated board for sixteen of the past

---

[109] Demand futility typically is analyzed on a claim-by-claim basis. *See Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014) (citing *Beam v. Stewart*, 833 A.2d 961, 977 n.48 (Del. Ch. 2003) *aff'd*, 845 A.2d 1040 (Del. 2004)). In this case, the parties did not analyze the three claims in the Complaint separately and the court sees no reason to do so because Lutnick is clearly the focal point of each claim. He is named as a defendant in his capacity as a BGC director for Count I, as BGC's controller for Count II, and as a BGC officer for Count III. Compl. ¶¶ 136, 140, 145. Thus, insofar as the court finds that the alleged facts create a reasonable doubt about a director's independence from Lutnick, that finding would apply to all of the claims in the Complaint.

[110] Compl. ¶ 40.

[111] *See* Tr. 48-49 (June 6, 2019).

twenty years suggests that Lutnick "trusts, cares for, and respects him"[112] and, reciprocally, that it would be important to Moran to maintain a good relationship with Lutnick, who has the unilateral ability to terminate the perquisites of Moran's board service to Cantor affiliates, which yielded Moran $931,986 (mostly in cash) over the past five years.[113]

In addition to alleging that Moran has had a lengthy and lucrative professional relationship with Lutnick, the Complaint alleges several specific facts from which it reasonably can be inferred that they have a close personal relationship, including that: (i) Moran and his wife have attended public events with Lutnick, including a black-tie gala in 2007 where the three of them were photographed together in a staged setting; (ii) Moran's wife honored Lutnick's sister at another gala event in 2014, and (iii) Lutnick offered to help arrange a private tour of the Tate Art Museum in London for Moran's wife and granddaughters, at the time that the Transaction was under consideration.[114] Although the tour did not occur, the alleged fact that Lutnick would use his influence to set up a private tour at a prominent museum in another

---

[112] *Sanchez*, 124 A.3d at 1023.

[113] Compl. ¶ 44. *See In re Oracle*, 2018 WL 1381331, at **17-20 (noting that each of the challenged directors stood to lose half a million dollars in director's fees if they were to lose the controller's support for their directorships, which standing alone would have been insufficient to establish a lack of independence on the part of the directors, but when viewed holistically, were deemed sufficient to constitute a "constellation of facts" that dictated that very conclusion).

[114] Compl. ¶¶ 41-43.

country as a favor to Moran, and that Moran's wife chose to honor Lutnick's sister, who co-founded the Cantor Fitzgerald Relief Fund with Lutnick, suggests that the relationship between Lutnick and Moran is a close one and not simply a "thin social-circle friendship."[115]

Taking into consideration the totality of the Complaint's allegations concerning the 20-year professional and personal relationship between Moran and Lutnick, and drawing all reasonable inferences in Plaintiffs' favor at this stage of the case, as the court must, Plaintiffs have adequately pled a "constellation of facts" that create a reasonable doubt about Moran's independence from Lutnick for purposes of deciding whether or not to bring a lawsuit against Lutnick.

### 2. Linda Bell

Bell has served with Lutnick on two Cantor-affiliated boards over the past ten years: (i) ELX Futures, from 2009 to July 2013; and (ii) BGC, since July 2013.[116] In 2015, Lutnick placed Bell on a publicly-filed list of potential board appointees to GFI.[117] Although Bell's board-service relationship with Lutnick has not been as lengthy as Moran's, she appears to be another of Lutnick's go-to choices for board appointments on companies he controls. As such, it is reasonable to infer that

---

[115] *Sanchez*, 124 A.3d at 1022.

[116] Compl. ¶¶ 26, 30.

[117] *Id.* ¶ 31.

Lutnick has confidence in Bell and that it would be important to Bell not to compromise her good relationship with Lutnick, who has the unilateral power to discontinue the benefits Bell has received from serving on Cantor-affiliated boards.

This inference is bolstered by specifically alleged facts suggesting that these board appointments have been financially material to Bell.[118] In particular, after conducting an ostensibly thorough search of publicly-available information, including Form 990's that tax-exempt organizations must file annually, Plaintiffs allege that Bell's board compensation from BGC (*e.g.*, $266,000 in 2017, with $216,000 paid in cash) has represented over 30% of her annual income in recent years during which she has served as Provost, Dean of the Faculty, and a Professor of Economics at Barnard College, and earned $351,409 and $373,547 in 2015 and 2016, respectively.[119]

Apart from their board service together, the Complaint goes on to plead more particularized facts about Bell's relationship with Lutnick. Before joining Barnard, Bell had an extensive career at Haverford College, dating back to the 1990's and

---

[118] *Orman*, 794 A.2d at 25 n.50 ("A director may be considered beholden to (and thus controlled by) another when the allegedly controlling entity has the unilateral power . . . to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.").

[119] Compl. ¶¶ 28-29.

including service as its Provost and the John B. Hurford Professor of Economic from 2007 to 2012.[120] While at Haverford, Bell, her husband, and Lutnick were members of the "1833 Society," which honors the most generous annual fund donors.[121] Over the past 25 years, Lutnick donated at least $65 million to Haverford, helping to pay for its Gary Lutnick Tennis & Track Center, Douglas B. Gardner '83 Integrated Athletic Center, Lutnick Library, Cantor Fitzgerald Art Gallery, and five student scholarships.[122] It can reasonably be inferred that these donations benefited Bell professionally as Provost at Haverford,[123] and deepened her personal relationship with Lutnick given his self-professed "Love" for Haverford College and its people.[124] In that vein, it is reasonable to infer it was no coincidence that Bell was first appointed to a Cantor-affiliated board during her tenure as Haverford's Provost.[125] Although Bell left Haverford several years ago, "past benefits conferred

---

[120] Compl. ¶ 26.

[121] *Id.*

[122] *Id.* ¶ 20.

[123] *See In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 930 (Del. Ch. 2003) (differentiating between, for the purposes of an independence analysis, tenured professors from those members of the university community such as "the University's President, deans, and development professionals, all of whom, it can be reasonably assumed, are required to engage heavily in the pursuit of contributions to the University"); *see also Off v. Ross*, 2008 WL 5053448, at *11 (Del. Ch. Nov. 26, 2008) (stating in approving a settlement that "Ross's substantial donation raises considerable doubt as to the independence of Dolan" who was the Dean of the University of Michigan School of Business when the donation was made).

[124] Compl. ¶ 20.

[125] *Id.* ¶¶ 26, 30.

. . . may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised."[126]

All-in-all, the particularized facts alleged paint a picture of a close relationship between Lutnick and Bell, both professionally and personally, such that there is a reasonable doubt as to Bell's independence from Lutnick for purposes of deciding whether or not to bring a lawsuit against Lutnick.[127]

### 3. Stephen Curwood

Similar to Bell, Curwood has served with Lutnick on a Cantor-affiliated board (BGC) for ten years, since December 2009, and Lutnick placed Curwood on a publicly-filed list of potential board appointees to another Cantor-affiliated entity—GFI.[128] The Complaint specifically alleges that Curwood received more than $1.3 million as a BGC director, including $938,000 over the past five years.[129]

The Complaint also alleges specific facts from which it reasonably may be inferred that Curwood's compensation as a BGC director, which Lutnick has the

---

[126] *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001).

[127] In reaching this conclusion, the court does not credit Plaintiffs' contention that "it is inconceivable that Lutnick played no role" in Bell's son gaining admission midway through high school to the Horace Mann School, an "elite private preparatory school" where Lutnick was on the board and was a "major donor." *See* Compl. ¶¶ 23-24, 27. While it is certainly possible this occurred, the Complaint's allegations concerning this matter are too speculative to credit.

[128] Compl. ¶¶ 31-32.

[129] *Id.* ¶ 38.

unilateral power to discontinue, would be financially material to him. Those allegations include that (i) since 1992, Curwood primarily has been employed as President of World Media Foundation, Inc., which, according to its Form 990's, paid total compensation to *all* of its executives in the amount of $61,939 in 2015, $107,104 in 2014, and $215,000 or less from 2011 to 2013; and (ii) since 2005, Curwood has been the Senior Managing Director of SENCAP LLC, an investment group allegedly run out of his residence in New Hampshire that "lacks any internet footprint whatsoever."[130] The Complaint further alleges, credibly, that Curwood's work as an occasional lecturer at Harvard, teacher of one course every other year at the University of Massachusetts, and as environmental journalist, likely generated less income than his BGC compensation.[131]

Like Bell, Curwood's ties to Lutnick predate his appointment to the BGC board, as he served with Lutnick on the Haverford Board of Managers for many years. Indeed, the Complaint alleges that Lutnick has been quoted saying he appointed Curwood to the BGC board because he "formerly served on the Board of Managers of Haverford with Mr. Curwood."[132] Since 2000, Curwood also has

---

[130] *Id.* ¶¶ 35-39.

[131] *Id.* ¶ 39.

[132] *Id.* ¶ 33.

35

served on the Haverford College Corporation, which holds "legal title to the College assets" and has a working group that encourages financial support to Haverford.[133]

As our Supreme Court said in *Marchand*, "any realistic consideration of the question of independence must give weight to . . . important relationships and their natural effect on the ability of the parties to act impartially toward each other."[134] Given Lutnick's extraordinary generosity to Haverford, and Curwood's own deep ties to Haverford, it stands to reason that Curwood naturally would be reluctant to support bringing a lawsuit against Lutnick. When this consideration is combined with the possibility that Curwood "could lose his rather lucrative directorship" and the status of serving on a public company board if he agreed to sue Lutnick, Plaintiffs have plead sufficient facts to create a reasonable doubt concerning Curwood's ability to be independent from Lutnick.[135]

*\* \* \* \* \**

---

[133] *Id.* ¶ 34. Defendants assert that since only some of the members of the Haverford College Corporation work to encourage donations, this allegation is insufficient. BGC Defs.' Opening Br. 38-39. But, as our Supreme Court has emphasized, the court must draw reasonable inferences from particularized facts in Plaintiffs' favor. *Sanchez*, 124 A.3d at 1022 ("[I]t cannot be ignored that although plaintiff is bound to plead particularized facts in pleading a derivative complaint, so too is the court bound to draw all inferences from those particularized facts in favor of the plaintiff, not the defendant, when dismissal of a derivative complaint is sought."). Thus, alleging Curwood's membership in an organization with fundraising as a goal is sufficient at this stage of the case.

[134] *Marchand*, 212 A.3d at 820.

[135] *See Oracle*, 2018 WL 1381331, at **17-20 (considering plaintiff's particularized facts, holistically).

For the reasons explained above, Plaintiffs have plead particularized facts that create a reasonable doubt that four of the directors serving on the Demand Board are either disinterested (Lutnick) or independent (Bell, Curwood, and Moran). Defendants' motion to dismiss the Complaint under Court of Chancery Rule 23.1 thus must be denied.

**D.** **Count I States a Claim Against the Special Committee Defendants**

The Special Committee Defendants also seek to dismiss Count I of the Complaint against them under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. The standard for deciding a motion to dismiss under Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[136]

The Special Committee Defendants are protected by a Section 102(b)(7) provision in BGC's certificate of incorporation.[137] "When a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director

---

[136] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotation marks omitted).

[137] Regan Aff. Ex. 1 (Dkt. 39).

harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[138]  For the reasons discussed above, Plaintiffs have plead facts supporting a rational inference that, by voting to approve the Transaction, Bell, Curwood, and Moran acted to advance the self-interest of an interested party who stood on both sides of the Transaction (Lutnick) from whom they could not be presumed to act independently.  Accordingly, the motion to dismiss under Rule 12(b)(6) is denied as to these three individuals.

The remaining member of the Special Committee, who is not on the Demand Board, is John Dalton.  The Complaint alleges that Dalton's professional relationship with Lutnick has spanned approximately twenty years, during which Dalton served on the following Cantor-affiliated boards:  (i) Cantor Exchange, an electronic exchange for trading U.S. Treasury futures that is a subsidiary of Cantor, since 1999; (ii) BGC, from 2002 until he resigned in December 2017 to accept a director position at Newmark around the time of its IPO; and (iii) Newmark, from late 2017 until late 2018.[139]  Lutnick also placed Dalton on a publicly-filed list of potential board appointees to GFI in 2015.[140]  Dalton allegedly received more than $2 million from

---

[138] *In re Cornerstone*, 115 A.3d at 1179-80.

[139] Compl. ¶¶ 46-47, 51.

[140] *Id.* ¶ 31.

38

his service on Cantor-affiliated boards, and for at least the past five years has derived 40-50% of his income from Cantor-affiliated entities.[141]

Under the heightened pleading standards of Rule 23.1, these facts, without more, [142] would not overcome the presumption of independence our law accords to a director of a Delaware corporation in my opinion.[143] Under the lower pleading standard of Rule 12(b)(6), however, it is reasonably conceivable that, when deciding whether or not to approve the Transaction, Dalton would be unwilling to jeopardize his longstanding position as one of Lutnick's go-to choices for Cantor-affiliated board appointments by negotiating harder for BGC to pay a lower price for Berkeley Point, or to reject the proposed Transaction outright, given how lucrative his Cantor-affiliated board positions have been to him and Lutnick's unilateral power to decide who should serve on those boards. In other words, it is reasonably conceivable that Dalton would not be presumed to have acted independently of Lutnick in deciding whether to approve the Transaction, which advanced Lutnick's self-interest.

---

[141] *Id.* ¶¶ 50-51.

[142] Unlike with the other Special Committee members, Plaintiffs have not plead facts suggestive of a meaningful personal relationship between Dalton and Lutnick outside of Dalton's lengthy service on Cantor-affiliated boards. The Complaint alleges Dalton is not independent because Dalton is a passionate supporter of Navy athletics and the Cantor Fitzgerald Relief Fund has donated to the Naval Academy Foundation. *Id.* ¶ 48. The Complaint, however, pleads no specifics concerning the magnitude of any such donations or whether Dalton had any role soliciting them.

[143] *Beam*, 845 A.2d at 1055.

Accordingly, the motion to dismiss Count I under Rule 12(b)(6) also is denied as to Dalton.

## IV. CONCLUSION

For the reasons explained above, both of defendants' motions to dismiss are denied.

**IT IS SO ORDERED.**